**Brian A. BUCKLEY, Petitioner,**

v.

**C.A. TERHUNE, Director of the California Department of Corrections, Respondent.**

**No. CV 00–2435–JSL(AJW).**

United States District Court, C.D. California, Western Division.

Dec. 6, 2002.

Allen R Bloom, Allen R Bloom Law Offices, San Diego, for Brian A Buckley, petitioner.

Noah P Hill, CAAG—Office of Attorney, General of California, Los Angeles, for C A Terhune, Director of the CDC, respondent.

## ORDER ADOPTING REPORT AND RECOMMENDATION OF MAGISTRATE JUDGE

LETTS, District Judge.

Pursuant to 28 U.S.C. § 636(b)(1)(C), the Court has reviewed the entire record in this action, the attached Report and Recommendation of Magistrate Judge ("Report"), and the objections thereto. Good cause appearing, the Court concurs with and adopts the findings of fact, conclusions of law, and recommendations contained in the Report after having made a *de novo* determination of the portions to which objections were directed.

**IT IS SO ORDERED.**

## REPORT AND RECOMMENDATION OF MAGISTRATE JUDGE

WISTRICH, United States Magistrate Judge.

### Facts [1]

Thomas Urell was murdered on July 16, 1986. Shortly after the murder, petitioner was arrested based on some traffic tickets and was interviewed by the police about the murder. At the direction of Deputy District Attorney Donald Glynn, petitioner was questioned "outside of *Miranda,*" and was promised that his statements would not be used against him. [Transcript of Evidentiary Hearing held on July 31, 2002 ("EHT") 9–10, 46–47; Evidentiary Hearing Exhibit ("EH Ex.") D at 55–58]. Relying on those assurances, petitioner provided the police with a detailed statement about the murder, including details about his own role and the role of Curtis Fauber. After providing that information, petitioner was neither arrested nor charged with any crime related to the murder. Instead, he took care of his traffic tickets and was released. [EHT 26, 47]. Mr. Fauber, by contrast, was prosecuted for capital murder.

More than a year later, the case against Mr. Fauber ran into trouble after the trial court suppressed Mr. Fauber's confession.

---

1. The following summary of the facts is based on the state court records and on the evidence presented during the evidentiary hearing held in this Court on July 31, 2002, including the demeanor of the witnesses while testifying. To the extent that the evidence conflicts, this summary of the facts reflects the Court's resolution of those conflicts and constitutes the Court's findings of fact. *See generally United States v. Ridgway,* 300 F.3d 1153(9th Cir. 2002).

Suddenly, the prosecution needed petitioner's testimony to prove the charges against Mr. Fauber. [*See* EHT 10–14, 181–182 (Mr. Glynn's explanation that he needed petitioner as a witness because he was "struggling to put together the Fauber case"); EH Ex. S (statement of Mr. Glynn at petitioner's December 18, 1996 parole hearing)].

On November 12, 1987, petitioner was arrested and charged with the first degree murder and robbery of Mr. Urell, and residential burglary. [EH Ex. B]. Before being charged with these offenses, petitioner, who had just turned 22 years old, had no criminal history other than traffic tickets. [EHT 49–50].

The preliminary hearing was held on December 14, 2002. [EH Ex. D]. The prosecution did not attempt to use petitioner's prior statements to the police against him. Instead, the prosecution relied on the testimony of Kristen McCarthy, a girlfriend to whom petitioner had confessed some involvement in the murder. [EH Ex. D at 74–90]. Petitioner's statements to Ms. McCarthy were admitted after the trial court rejected petitioner's motion to suppress them. [EH Ex. D at 55–72]. At the conclusion of the preliminary hearing, the trial court found the evidence against petitioner sufficient to warrant a trial. [Clerk's Transcript ("CT") at 112].

The following day, Mr. Glynn, the prosecutor assigned to petitioner's case, sent petitioner's attorney, Willard Wiksell, a letter offering a plea bargain. The plea offer required that petitioner plead guilty to murder, and cooperate with the prosecution by testifying truthfully against Mr. Fauber and Christopher Caldwell regarding their participation in the murders of Mr. Urell and two others. [EH Ex. E; EHT 187–189]. In exchange, the prosecutor stated he would ask the court to declare the charge against petitioner to be second degree murder and to dismiss the charges of burglary and robbery. The letter said nothing about the sentence that petitioner would receive. [EH Ex. E; EHT 183–184, 191].

After receiving the letter from the District Attorney's Office, Mr. Wiksell brought a copy of the letter to petitioner and discussed the plea offer with him. [EHT 52–53, 56]. Mr. Wiksell explained that if petitioner pleaded guilty, he would receive a 15 year sentence, and could be out in seven and one-half years if petitioner behaved himself in prison. [EHT 56–57, 77 112].[2]

Petitioner signed the letter on December 17, 1987. [EH Ex. E at 12; EHT 58–59]. On the same date, petitioner signed a form entitled "Felony Disposition Statement" that set forth the terms of the plea bargain. [EH Ex. H; EHT 59, 174]. Portions of the form had been filled out by Mr. Glynn, and when petitioner received it,

---

**2.** Mr. Wiksell testified that he had no recollection of what he actually told petitioner about the sentence petitioner faced if he pleaded guilty to second degree murder. [EHT 127–134, 166]. Nor did Mr. Wiksell have any recollection of what happened at petitioner's change of plea hearing. [EHT 159–160, 163–164]. Instead, Mr. Wiksell testified about what his general practice would have been in circumstances such as those presented in petitioner's case, what he believed he would have advised petitioner given

the circumstances, and his understanding of the sentence for the offense of second degree murder as of the time of the evidentiary hearing(rather than his understanding at the time he advised petitioner). [EHT 127–170]. Given Mr. Wiksell's lack of any specific recollection, and considering his demeanor while testifying, the Court gives little weight to Mr. Wiksell's testimony and finds it of little value in determining what petitioner actually was told regarding the sentence he would receive if he accepted the plea offer.

there were little "x"s indicating where petitioner was supposed to place his initials. [EHT 61–62, 174–176; EH Ex. H].[3]

In pertinent part, the Felony Disposition Form indicates that petitioner will change his plea to a plea of guilty to murder. It further states that

My attorney has explained to me the direct and indirect consequences of this plea including the maximum possible sentence. I understand that the following consequences could result from my plea:

____ **I could be sentenced to the state prison for a maximum possible term of 15 year(s).**

____ **After I have served my prison term, I may be subject to a maximum parole period of life** (*In re Carabes*, 144 Cal.App.3d 927, 193 Cal.Rptr. 65).

____ I will be ordered to pay a fine of not less than $100 nor more than $10,000 (Gov't.Code § 13967).

[EH Ex. H at 5–6]. Petitioner initialed these three statements describing the consequences of his plea. [EH Ex. H at 6; EHT 62–63].[4] He also initialed other parts of the form indicating that he understood and waived his constitutional rights,

and that his plea was entered into freely and voluntarily. [EH Ex. H at 5–6]. The form was returned to Mr. Glynn at some time prior to the January 4, 1988 change of plea hearing. [EHT 108–109, 176–177].

The second portion of the Felony Disposition Statement is entitled "The District Attorney's Position On Sentence" and "Summary of District Attorneys' Reason for Sentence." [EHT 66–67, 177; EH Ex. F at 7]. With respect to the "position on sentence", Mr. Glynn wrote in:

At the time of sentencing the People will move the court to declare the murder to be murder in the second degree, with a maximum term of 15 years to life.

[EH Ex. H at 7]. Mr. Glynn had not filled out the second portion of the form before petitioner read, initialed, and signed the other portions of the form on December 17, 1987. [EHT 66–68, 114–115].[5] Petitioner never saw or initialed the second portion of the form. [EHT 115; EH Ex. H at 7–8].

Pursuant to the terms of the plea bargain, petitioner was interviewed by Larry Troxel, a District Attorney's investigator, on December 21, 1987. [EHT 14–15, 70–

---

**3.** Mr. Wiskell had no recollection of discussing the Felony Disposition Statement with petitioner. [EHT 149–151, 161]. Petitioner testified that the district attorney brought the form to him. [EHT 59].

**4.** Based upon the colloquy in court on January 4, 1988, it appears that the parole term of "life" may not have been written on the form at the time petitioner initialed it. [Reporter's Transcript of Proceedings January 4, 1988 ("RT") 5; EHT 202–203, 213]. The blank in which that word appears probably was filled in during the change of plea hearing. [*See* RT 5].

**5.** Mr. Glynn testified that it was his "belief" that he filled it out this portion of the form before giving the form to Mr. Wiksell in December, 1987. [EHT 177, 195–197]. He admitted, however, that he did not initial this

portion of the form until the January 4, 1988 hearing. [EHT 192–195]. At another point, he testified that he was "certain" that he filled out this portion of the form before giving it to Mr. Wiksell in December, 1987. [EHT 213]. On the other hand, Mr. Glynn repeatedly testified that he had no independent recollection of when he filled out any portion of the Felony Disposition Statement. [EHT 180, 191, 196]. Understandably, Mr. Glynn's testimony appears to be based upon his general practice rather than on any specific recollection of his actions in petitioner's case, which occurred more than 14 years earlier. [EHT 192–193]. Considering all the circumstances, including Mr. Glynn's demeanor while testifying, the Court finds his testimony that the second portion of the form was filled out and provided to petitioner before petitioner signed and initialed the form in December 1987 to be unconvincing.

71; EH Ex. F]. Mr. Troxel, who had been an investigator with the Ventura County District Attorney's Office for ten years at the time, was assigned to handle the investigation of the case against Mr. Fauber, as well as the case of petitioner. [EHT 6–7]. During the December 21, 1987 interview, or perhaps during another meeting where Mr. Glynn and petitioner were present, the plea bargain offered by the prosecution was discussed. Based upon those discussions, Mr. Troxel believed that petitioner would plead guilty to second degree murder and would receive a sentence of "15 years tops," so long as he testified truthfully against Mr. Fauber. [EHT 16]. His understanding was that petitioner would not be required to serve "any time beyond 15 years." [EHT 16]. In fact, there was some discussion to the effect that petitioner would "probably do less than the 15 years, perhaps half that time." [EHT 16–17]. It was not Mr. Troxel's understanding that petitioner's sentence would be 15 years to life in jail. [EHT 17]. Mr. Troxel conveyed his understanding of petitioner's sentence to petitioner's mother, Jynx Schoaf, during a conversation with her. [EHT 24]. Mr. Troxel made it clear that his understanding of petitioner's sentence was based upon his conversations with Mr. Glynn. [EHT 20, 24]. Mr. Glynn testified that he had no doubt as to Mr. Troxel's integrity and believability. [EHT 211].

On January 4, 1988, before the change of plea hearing, petitioner met with Mr. Wiksell, Mr. Troxel, and Mr. Glynn in the holding cell outside of the courtroom. [EHT 72–73]. The four men discussed whether or not petitioner should plead guilty. Petitioner was reluctant to agree to the plea bargain because he feared violent retaliation by Mr. Fauber, Mr. Caldwell, or other inmates because of his cooperation with the prosecution. [EHT 57–58, 73–74; Memorandum in Support of Petition, Ex. D (Declaration of Brian Buckley ("Buckley Decl.")) at 32].[6] He was having second thoughts because the benefits of the deal did not seem worth the risk of physical harm. In particular, in evaluating the advantages and disadvantages of pleading guilty, petitioner compared what he believed his maximum sentence would be if he were convicted on the charges—25 years—to the sentence he would receive if he pleaded guilty—15 years.[7] [EHT 73]. Further, petitioner believed that, assuming good behavior, he would serve only half of either sentence so that the difference between the two sentences did not seem substantial. [EHT 73]. At that time, petitioner was told by either Mr. Glynn or Mr. Wiksell that he should focus on the 7½ years he would be serving if he accepted the plea offer. He was also told that he could get a degree in prison and start his own business after he was released, since

---

**6.** Petitioner's concerns apparently were well-founded. As the trial court stated during sentencing:

The Court finds and the Court requests that the clerk show on the Abstract and the Minutes that the Defendant's life is in danger in prison because of the testimony that he gave against his co-defendant in this case, and because of expected testimony in another murder case; and that the Court requests that the Department of Corrections give the Defendant protective custody status in state prison and seriously consider him as a candidate for out-of-state placement.

[RT 18].

**7.** Although petitioner used the phrase "25 years to life," he believed—akin to his understanding of the phrase "15 years to life"-that the phrase "25 years to life" meant a maximum of 25 years in prison, followed by the possibility of life on parole. [EHT 57, 84–85]. As explained in detail below, petitioner's understanding was the result of having initially been misinformed (twice) about his potential sentences.

he would still be a young man. [EHT 73–74].

Petitioner then went into the courtroom and changed his plea to guilty. It was on that date that both Mr. Glynn and Mr. Wiksell signed the Felony Disposition Statement. [EH Ex. H at 8; EH Ex. J].

In the course of the plea proceedings, the following colloquy transpired between Mr. Glynn and petitioner:

Q. All right, Mr. Buckley, I understand that today you're going to plead guilty to Count 1 of the Information CR23005; is that correct?

A. Yes.

Q. I'm going to read the count for you. "The District Attorney of the County of Ventura accuses Brian Buckley of the crime of violation of section 187 of the Penal Code in that on or about July 16, 1986 in the County of Ventura, State of California, that you did wilfully, unlawfully and with malice aforethought murder Thomas Urell, a human being."

Do you understand the charge in Count 1?

A. Yes.

Q. Now, I have here a Felony Disposition Statement that I'm going to go over with you. There are several other charges on the information that will be dismissed at the time of sentencing; do you understand that?

A. Yes.

Q. And do you also understand that the murder will be declared by the Court to be second degree murder at the time of sentencing.

A. Yes.

Q. And this is contingent upon certain things that you will have to do in turn. But let me get into the waiver of your rights. Are you entering into this plea voluntarily and not as the result of any pressure, force, threats or coercion brought against you or members of your family?

A. Yes.

Q. And have any commitments been made to you other than those shown in this Felony Disposition form and also in this letter dated December 15th that will be made a part of the Felony Disposition form?

A. Yes.

Q. No, I think you misunderstood my question. Do these two forms, the letter dated December 15th and the Felony Disposition form, this yellow form that you have signed -

A. Yeah.

Q. do these two forms contain all of the promises that have been made to you in this case?

A. Yes.

Q. Have you discussed the facts of the case with your attorney and discussed all the possible defenses that you might have to this case?

A. Yes.

Q. Now before a plea can be accepted the Court has to consider a document for proof of the factual basis for your plea. Do you agree that the Court can consider the preliminary hearing transcript to make that determination?

A. Yes.

Q. And has your attorney explained all of the consequences of your plea to this charge?

A. Yes.

Q. **Do you understand that for second degree murder you could be sentenced to state prison for a maximum possible term of 15 years?**

A. Yes.

Q. And do you understand that after serving a prison term you'll be subject to a parole period—I'm sorry your Honor, does the Court know the parole period for second degree murder? I didn't enter that in the document.

THE COURT: Yes, it's—the possibility is parole for life.

Q. (BY MR. GLYNN:) All right. I've entered this into the document. **You could be subject to a parole period of life.** And you could also be ordered to pay a fine of not less than a hundred dollars nor more than $10,000. Do you understand that?

A. Yes.

[Reporter's Transcript of Proceedings January 4, 1988 ("RT") 3–5] (emphasis added).

After petitioner waived his constitutional rights to a jury trial, to confront and cross-examine witnesses against him, and his right against self-incrimination [RT 5–6], Mr. Glynn continued:

Q. Now as I stated before and it's also contained in this Felony Disposition form, that at the time of sentencing the people will ask the Court to declare the murder to be murder in the second degree **with a maximum term of 15 years to life.** And the People's reason for entering into that agreement are contained in this document that's attached to the Felony Disposition Statement.

I'd like to go into the terms of this agreement with you. In order—or as part of the agreement you will agree to cooperate in the trials against Curtis Fauber and Christopher Cogwell [sic], and that you will testify in the Fauber case at all proceedings regarding the murder of Thomas Urell, David Church and Jack Dowdy, and testify truthfully regarding whatever you know about those murders. Do you understand that to be the situation?

A. Yes.

Q. And do you agree that you will testify truthfully and cooperate in those proceedings?

A. Yes.

Q. And you also agree to testify against Curtis—I'm sorry, against Christopher Cogwell [sic] regarding the murder of David Church, and that would be both in trial and in a preliminary hearing. Do you understand that to be the case?

A. Yes.

\* \* \* \* \* \*

Q. At the end of the case against Curtis Fauber and at the end of the preliminary hearing against Christopher Cogwell [sic] you'll be sentenced at that time and the People will move that the Court declare the murder to be second degree and you'll be sentenced accordingly; do you understand that?

A. Yes.

\* \* \* \* \* \*

Q. I'm showing you the Felony Disposition form, this yellow form here, that has some initials B.B. against a number of the paragraphs. Also has the initials D.C.G. which are my initials against some of the paragraphs. And at the end of the form I see the date December 17, 1987 and your signature. Did you sign this document on that date?

A. Yes.

Q. And did you sign this document because you read each of the paragraphs that you have initialed and you understand what's contained in these paragraphs?

A. Yes.

[RT 6–8] (emphasis added).

The trial court then took petitioner's guilty plea and found that plea to be knowing and voluntary. [RT 8–9]. When setting the date for sentencing, the trial court informed the parties that he would be leaving the department at the end of January and asked counsel whether they wanted him to keep the case for sentencing or have a different judge sentence petitioner. [RT 12]. Mr. Wiksell responded, "normally wouldn't make any difference because

it's a second degree murder and you can only sentence him to 15 to life. But given the little wrinkle of the federal prison [8] and the conversations that have gone by, I would prefer that the case remain with you, your Honor." [RT 12].

Petitioner performed his part of the plea bargain.

First, petitioner pleaded guilty to the charge of murder, relinquishing his constitutional rights, including his rights to a jury trial, to confront the evidence against him, and to require the State to prove the case against him beyond a reasonable doubt, and so on.

Second, petitioner ran the risk of retaliation and physical harm, a risk which the trial court took seriously.

Third, petitioner testified against Mr. Fauber on January 7, 1988. [EH Ex. K]. At that time, petitioner stated that he expected to receive a sentence of "15 years to life" in exchange for his guilty plea, so long as he testified truthfully. [EH Ex. K at 3305–3310]. There was no explanation of precisely what a term of "15 years to life" meant.

Fourth, petitioner testified during Mr. Caldwell's preliminary hearing on January 22, 1988. On that occasion, petitioner testified that he had entered a plea bargain whereby he would testify against Messrs. Fauber and Caldwell in exchange for a reduction of his offense to second degree murder. [EH Ex. L at 25–26]. There was no discussion of the sentence petitioner would receive.[9]

Fifth, on February 9, 1988, petitioner testified during the penalty phase of Mr. Fauber's trial. [EH Ex. M]. On cross-examination, Mr. Fauber's attorney sought to impeach petitioner by showing that petitioner had received a "sweet deal" in exchange for his testimony against Mr. Fauber:

Q. Mr. Buckley, you expect to be released from prison someday, don't you?

A. Yes.

Q. When do you think that's going to occur?

MR. GLYNN: Objection. This isn't relevant.

THE COURT: Overruled.

THE WITNESS: Seven and a half years.

BY MR. FARLEY [MR. FAUBER'S COUNSEL]:

Q. Seven and a half years.

A. Yes.

[EH Ex. M at 4942; EHT 87–89]. Petitioner's answer, given under oath, reflected his understanding that he would receive a maximum sentence of 15 years in custody, pursuant to which—so long as he stayed out of trouble and worked in prison—he would be released in half of the maximum. [EHT 89–90].

Mr. Glynn, who heard petitioner testify that he expected to be released in 7½ years, understood petitioner's sentence differently. Mr. Glynn, however, never made any attempt to clarify, explain, or discuss petitioner's evident misapprehension about his sentence. [RT 202–209]. As Mr. Glynn explained

[t]his single line of cross-examination about the seven and a half years probably surprised me at the time, but it was not the sort of thing that was going to

8. Petitioner had requested placement in a federal prison as a protective measure. [*See* RT 10–12].

9. At Mr. Caldwell's trial, petitioner refused to testify. He relied upon the Fifth Amendment, explaining that he did not want to testify because of his concerns regarding publicity. [EH Ex. P]. As a result, he was declared an unavailable witness, and his preliminary hearing testimony was admitted. [EH Exs. P & S].

remain in my memory and be something that I would say, oh, gee, I have to take care of that as soon as a I have a spare moment. I was too busy with the other activities involved in the penalty phase for Fauber.

[EHT 215].

Petitioner was sentenced on March 1, 1988. Before the sentence was imposed, Mr. Glynn informed the trial court that petitioner had complied with his part of the plea bargain, and moved to have Count 1 declared to be second degree murder and to dismiss the remaining counts and special allegations. The motions were granted. [RT 13A–14]. The trial court then sentenced petitioner to "the term prescribed by law as 15 years to life." [RT 18]. No one voiced any objection to the sentence.

Based upon the advice petitioner received from Mr. Wiksell, the statements he initialed in the Felony Disposition Statement, the statements made by Mr. Glynn both on and off the record, and Mr. Glynn's failure to correct petitioner when petitioner explained his understanding of his sentence under oath, petitioner actually and reasonably believed that the maximum time he would serve in prison was 15 years. [EHT 63, 69–70, 98–99]. At no point did anyone actually tell petitioner that he faced a sentence longer than 15 years. [EHT 78]. Accordingly, when the prosecutor or the trial court used the term "15 years to life," petitioner understood that phrase to refer to the sentence as it originally had been explained to him— namely, that he faced a maximum of 15 years in prison, after which, he would be on parole, possibly for the rest of his life. [EHT 63, 78–81, 92–93, 98–99]. There is no credible evidence that petitioner's counsel, the prosecutor, or the court—all of whom understood the correct meaning of the phrase "15 years to life"—actually told petitioner that the phrase meant some-thing different than petitioner thought it did.

Petitioner's understanding was reasonable. Both Mr. Wiksell and Mr. Glynn testified that, standing alone, the part of the Felony Disposition Statement which stated that "I understand that I could be sentenced to the state prison for a maximum possible term of 15 years" reasonably could be understood as a determinate sentence of 15 years maximum. [EHT 157–158, 198–199].

Petitioner's testimony regarding his understanding of his sentence is corroborated by a letter he wrote to Judge McGrath before sentencing. In that letter, petitioner stated that he wished that he "wouldn't have to go to prison for 15 years to life," then stated "I realize I should go to prison, but 15 years even half with parroll [sic] is a lot of time for this." [EH Ex. N at 40–42]. Later in that letter, petitioner stated that he believed that he deserved less than 15 years. [EH Ex. N at 42; EHT 95–98]. As petitioner explained during the evidentiary hearing, when he wrote "15 years to life," he meant 15 years in prison, with the possibility that he could be released after 7½ years, followed by life on parole. [EHT 96–97].

In addition, on May 26, 1988, only a few months after being sentenced, petitioner wrote a second letter to Judge McGrath. That letter also reflects his understanding of his sentence as a maximum 15 year term, and that he could be released after 7½ years. In petitioner's words:

I'm writing this letter because I don't want to even take the stand against Chris Caldwell until I get a state appointed defender to look into my case and talk with me. I don't think it is right to give me a lawyer as incompetent as Wiksel [sic]. He's lied to me from the begining [sic]. When I took the deal I thought my first parol [sic] date was

going to be in seven and a half years. I even said that in Curtis Fauber's trial. My first parol [sic] date is in ten years. I didn't even find out the truth till last month at CMC.

[EH Ex. Q at 1].

As petitioner explained during the evidentiary hearing, he wrote the second letter because Mr. Wiksell had told him that he would be eligible for release after 7½ years, but he subsequently learned from other inmates that due to the operation of "good time credits," he would not be eligible for release until after he had served 10 years of his sentence. [EHT 102–104].[10] Although he had learned that he could not be released after as few as 7½ years, at the time he wrote this letter, petitioner still believed that he could not be required to serve any more than 15 years in prison. [EHT 103–104].

It was not until petitioner's documentation hearing before the parole board in 1993 or 1994 that he first learned that he was facing a maximum term of longer than 15 years. [EHT 104–105]. Petitioner did not believe the parole board member who told petitioner that he was serving a life sentence, so petitioner hired an attorney to look into it. [EHT 105]. After confirming that petitioner's sentence was actually an indeterminate life sentence, the attorney filed a state habeas petition on petitioner's behalf. [EHT 105].

### Procedural Issues

Before reaching the merits of the petition, the Court must consider respondent's arguments that the petition should be dismissed because it is untimely pursuant to 28 U.S.C. § 2244(d) and because ground one of the petition is not exhausted.

### 1. The statute of limitation

The AEDPA amended section 2244(d) to impose a one-year statute of limitations for the filing of habeas corpus petitions by state prisoners. 28 U.S.C. § 2244(d).[11] Section 2244(d) provides:

(d)(1) A 1–year period of limitation shall apply to an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court. The limitation period shall run from the latest of—

(A) the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review;

(B) the date on which the impediment to filing an application created by State action in violation of the Constitution or laws of the United States is removed, if the applicant was prevented from filing by such State action;

(C) the date on which the constitutional right asserted was initially recognized by the Supreme Court, if the right has been newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review; or

(D) the date on which the factual predicate of the claim or claims pre-

10. California law allows prisoners to earn good time and work time credits to reduce the amount of time they must serve. Good time credits are earned for good behavior, and work time credits are earned for work performed. Cal.Penal Code §§ 2930, 2933. However, persons convicted of first or second degree murder may not receive work time credits. Cal.Code Regs. Title 15 § 3043(d)(1). In addition, a second degree murder convic-

tion carries a minimum parole eligibility date of 10 years.

11. The statute of limitation set forth in section 2244(d) was added by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"). Because this petition was filed after the enactment of the AEDPA, it is governed by those amendments. *Fuller v. Roe*, 182 F.3d 699, 702 (9th Cir.1999)(per curiam).

sented could have been discovered through the exercise of due diligence. (2) The time during which a properly filed application for State post-conviction or other collateral review with respect to the pertinent judgment or claim is pending shall not be counted toward any period of limitation under this subsection.

28 U.S.C. § 2244(d)(1) & (2).

Petitioner's conviction became final in 1989, 40 days after the California Court of Appeal affirmed his conviction on February 3, 1989. [See Motion to Dismiss, Ex. C]. See Rule 24 & 28(b) of the Cal. Rules of Court.[12] Because petitioner's conviction became final prior to the enactment of the AEDPA, the limitation period did not begin to run until April 24, 1996. Absent any tolling, petitioner had until April 24, 1997 within which to file his federal petition. See Patterson v. Stewart, 251 F.3d 1243, 1245–1246 (9th Cir.2001).

Petitioner filed three state applications for relief which tolled the limitation period. First, on May 13, 1996, approximately three weeks after the limitation period began running, petitioner filed a habeas petition in the Ventura County Superior Court. The petition was denied on September 10, 1996. [Motion to Dismiss, Ex. D].

Next, petitioner filed a habeas petition in the California Court of Appeal on December 22, 1997. [Motion to Dismiss, Ex. E]. The petition was denied on February 17, 1998. [Motion to Dismiss, Ex. F].

Petitioner proceeded to the California Supreme Court, filing a habeas petition on August 11, 1998. [Motion to Dismiss, Ex. G]. The California Supreme Court denied the petition on March 31, 1999, without citation to any procedural barrier. [Motion to Dismiss, Ex. H]. Petitioner then filed this federal habeas petition on March 7, 2000.[13]

■ The limitation period is tolled "for all of the time during which a state prisoner is attempting, through proper use of state court procedures, to exhaust state court remedies with regard to a particular post-conviction application." Nino v. Galaza, 183 F.3d 1003, 1006 (9th Cir.1999), cert. denied, 529 U.S. 1104, 120 S.Ct. 1846, 146 L.Ed.2d 787 (2000). As the Ninth Circuit explained, the word "pending" in section 2244(d)(2) should be broadly con-

---

12. Petitioner explains that it was not until 1995, when he was provided with a "documentation hearing" in prison, that he learned that his sentence was not what he thought it was. [Motion to Dismiss, Ex. E at 69; Petition, Ex. D (Declaration of Brian A. Buckley)]. Petitioner then retained counsel to initiate a challenge to his plea. Petitioner's allegations regarding the discovery of his actual sentence during a 1995 prison hearing supports the conclusion that the one year period of limitation did not begin until his discovery of his claim. See 28 U.S.C. § 2244(d)(1)(D). Nevertheless, petitioner is entitled to a later date based upon the one year "grace" period. See Calderon v. United States District Court (Beeler), 128 F.3d 1283, 1286–1287(9th Cir.1997) (holding that the one-year statute of limitations did not begin to run against any petitioner until the AEDPA's effective date of April 24, 1996), cert.

denied, 522 U.S. 1099, 118 S.Ct. 899, 139 L.Ed.2d 884 & 523 U.S. 1061, 118 S.Ct. 1389, 140 L.Ed.2d 648 (1998), overruled on other grounds by Calderon v. United States District Court (Kelly), 163 F.3d 530, 540 (9th Cir.1998) (en banc), cert. denied, 526 U.S. 1060, 119 S.Ct. 1377, 143 L.Ed.2d 535 (1999).

13. Because petitioner is not proceeding pro se in this action, and was represented by counsel throughout his state collateral proceedings, he is not entitled to the benefit of the "mailbox rule," pursuant to which a pro se prisoner's pleading is deemed filed at the moment the prisoner delivers it to prison authorities for forwarding to the clerk of court. See Houston v. Lack, 487 U.S. 266, 276, 108 S.Ct. 2379, 101 L.Ed.2d 245 (1988) (describing the "mailbox rule" and its rationale).

strued, as it is in other federal habeas contexts. *Nino,* 183 F.3d at 1005–1006. *Nino* held that a properly filed application for state collateral review is "pending" within the meaning of section 2244(d)(2) for "all of the time during which a state prisoner is attempting, through proper use of state court procedures, to exhaust state court remedies with regard to a particular post-conviction application." *Nino,* 183 F.3d at 1006. Based on the facts presented in that case—a petitioner who filed state habeas petitions first in the Los Angeles County Superior Court, then in the California Court of Appeal, and finally in the California Supreme Court—the court concluded that the limitation period was tolled from the date on which the prisoner filed his first state habeas petition in the Superior Court until the date on which the California Supreme Court denied the petition. *Nino,* 183 F.3d at 1006.

In *Carey v. Saffold,* 536 U.S. 214, 122 S.Ct. 2134, 153 L.Ed.2d 260 (2002), the Supreme Court endorsed the construction of the word "pending" that had been adopted in *Nino.* As the Supreme Court explained, the word "pending" covers the time between a lower court's decision and the filing of an original state habeas petition in a higher court. *Carey,* 122 S.Ct. at 2136–2142. Thus, the Court held that a state application is pending "as long as the ordinary state collateral review process is 'in continuance'—i.e., 'until the completion of' that process." *Carey,* 122 S.Ct. at 2138 (quoting Webster's Third New International Dictionary 1669 (1993)).

■ Pursuant to *Carey* and *Nino,* then, the limitation period was tolled for the entire period from the time petitioner filed his first state petition in the Superior Court until thirty days after the California Supreme Court denied his last habeas petition. *See Corjasso v. Ayers,* 278 F.3d 874, 879–880 (9th Cir.2002) (stating that the California Supreme Court's denial of a habeas petition is not final until 30 days after the date of the denial and adding the 30 days to period of *Nino* tolling); *Bunney v. Mitchell,* 262 F.3d 973, 974 (9th Cir.2001) (per curiam) (same). Accordingly, the limitation period was tolled from May 13, 1996 (the date on which petitioner filed his first state petition in the California Superior Court) until April 30, 1999 (30 days after the California Supreme Court denied his habeas petition). When petitioner filed his first state petition on May 13, 1996, 19 days had expired from the beginning of the limitation period. Thus, petitioner had 346 days of the one year limitation period remaining. Petitioner's federal petition, then, was due 346 days after April 30, 1999—that is, no later than April 10, 2000. Petitioner filed this petition on March 7, 2000, and therefore the petition is timely.

Respondent argues that *Nino* should not apply to petitioner because petitioner was not "properly pursuing and exhausting his state remedies" during this entire period. In particular, respondent argues that petitioner waited too long in between each state court's denial of his petition and the filing of the next petition. [Motion to Dismiss at 6–10].[14]

■ A California prisoner is not entitled to tolling under section 2244(d)(2) if he delayed "unreasonably" in seeking further review of his petition. *Carey,* 122 S.Ct. at 2139–2141. Petitioner, however, did not delay unreasonably in seeking review by

---

14. Petitioner waited a little more than one year after the Superior Court's denial of his first state petition before filing his second state petition in the California Court of Appeal. Petitioner also waited several months after the California Court of Appeal's denial of the his second state petition before filing his third state petition in the California Supreme Court.

higher state courts. Although a one year delay might sometimes be considered "unreasonable," petitioner has provided a detailed account of the reasons for his delay. As petitioner's counsel explains, petitioner's delay was due to difficulties encountered in attempting to obtain evidence to support his claim. At least some of the delay was attributable to the prosecutor's refusal to provide petitioner with relevant records, and the fact that petitioner's trial counsel had lost or destroyed relevant records. [Response to Motion to Dismiss at 3]. *Cf. Ford v. Hubbard,* 305 F.3d 875, 888 (9th Cir.2002) (noting that "lack of access to one's legal papers may constitute an 'extraordinary circumstance' that would warrant equitable tolling in instances in which the state is responsible for the unavailability.") (citing *Whalem/Hunt v. Early,* 233 F.3d 1146, 1146 (9th Cir.2000) (en banc)). More importantly, petitioner's counsel points out that the reasons for the delay were explained to the state court under penalty of perjury, and that no state court denied any petition on the ground of undue delay or untimeliness. Instead, the California Superior Court addressed the merits of petitioner's claims without reference to any procedural deficiency. Both the California Court of Appeal and the California Supreme Court subsequently denied petitioner's petitions without explanation or citation. [*See* Response to Motion to Dismiss at 3; Motion to Dismiss, Exs. D–H]. The higher courts' "silent" denials of petitioner's habeas petitions indicate that both courts considered and rejected petitioner's claims on the merits.[15] *See Ylst v. Nunnemaker,* 501 U.S. 797, 803–806, 111 S.Ct. 2590, 115 L.Ed.2d 706 (1991) (explaining that federal courts "look through" unexplained state orders denying habeas petitions to the last reasoned decision by a state court and presume that the higher court denied the claims for the same reason as the lower court); *Harris v. Superior Court,* 500 F.2d 1124, 1128–1129 (9th Cir.1974) (en banc) (holding that where the state court rejects a claim without citation to authority, this indicates that it has considered and rejected the claim on the merits); *Hunter v. Aispuro,* 982 F.2d 344, 347–348 (9th Cir.1992) (continuing to treat postcard denials as denials on the merits after *Coleman v. Thompson,* 501 U.S. 722, 111 S.Ct. 2546, 115 L.Ed.2d 640 (1991)), *cert. denied,* 510 U.S. 887, 114 S.Ct. 240, 126 L.Ed.2d 194 (1993); *cf. Carey,* 122 S.Ct. at 2140–2141 (remanding case for determination whether petitioner "unreasonably" delayed where petitioner waited four and one half months between lower court's denial of habeas petition and filing of petition in California Supreme Court and where California Supreme Court stated that the petition was denied "on the merits and for lack of diligence;" noting that if the California Supreme Court had clearly ruled that the petitioner's delay was "unreasonable," "that would be the end of the matter, regardless of whether it also addressed the merits of the claim, or whether its timeliness ruling was 'entangled' with the merits"; and recognizing that special circumstances may warrant the conclusion that the petition was not unreasonably delayed).

### 2. Exhaustion

Respondent argues that petitioner has not exhausted his state remedies as to ground one of the petition.

 The AEDPA provides that

[a]n application for a writ of habeas corpus on behalf of a person in custody

---

**15.** Respondent separately agrees. In both his return and his post-evidentiary hearing brief, respondent argues that the California Supreme Court's decision rests on the same grounds as the California Superior Court. [Return at 9–10; Respondent's Post Evidentiary Brief at 13–14].

pursuant to the judgment of a State court shall not be granted unless it appears that the applicant has exhausted the remedies available in the courts of the State.

28 U.S.C. § 2254(b)(1)(A). The exhaustion requirement is satisfied when the substance of a petitioner's federal claim has been fairly presented to the state's highest court. *See Castille v. Peoples*, 489 U.S. 346, 350, 109 S.Ct. 1056, 103 L.Ed.2d 380 (1989); *Kelly v. Small*, 300 F.3d 1159, 1161 (9th Cir.2002); *Lyons v. Crawford*, 232 F.3d 666, 668 (9th Cir.2000), *amended* 247 F.3d 904 (2001). Fair presentation requires that a petitioner alert the state court that his claim is based on federal law. *Duncan v. Henry*, 513 U.S. 364, 365, 115 S.Ct. 887, 130 L.Ed.2d 865 (1995) (per curiam). As the Supreme Court has held, a habeas claim must "include reference to a specific federal constitutional guarantee, as well as a statement of the facts that entitle the petitioner to relief." *Gray v. Netherland*, 518 U.S. 152, 162–163, 116 S.Ct. 2074, 135 L.Ed.2d 457 (1996); *see Hiivala v. Wood*, 195 F.3d 1098, 1106 (9th Cir.1999), *cert. denied*, 529 U.S. 1009, 120 S.Ct. 1281, 146 L.Ed.2d 228 (2000). Indeed, the Ninth Circuit recently reiterated that "a petitioner must characterize [his] claims '**specifically** as federal claims.'" *Kelly*, 300 F.3d at 1165,citing *Lyons*, 232 F.3d at 670("the petitioner must have either referenced specific provisions of the federal constitution or statutes or cited to federal case law") (emphasis in original). With these requirements in mind, the Court compares the claims raised in the California Supreme Court with ground one of the federal petition.

In ground one of the federal petition, petitioner alleges that his guilty plea "was invalid under the Due Process Clause of the United States Constitution" because petitioner did not understand the sentence he would receive. In support of his claim, petitioner cites *Santobello v. New York*,

404 U.S. 257, 261, 92 S.Ct. 495, 30 L.Ed.2d 427 (1971) and *Mabry v. Johnson*, 467 U.S. 504, 508, 104 S.Ct. 2543, 81 L.Ed.2d 437 (1984), and argues that he reasonably believed that he was entering a plea bargain pursuant to which he would receive a determinate sentence of 15 years in prison, followed by a parole term of life, and that his belief was the result of statements made by the prosecutor and the trial court, and as well as his own attorney's failure to clarify those statements. [*See* Memorandum in Support of Petition at 7–14].

■ In his petition filed in the California Supreme Court, petitioner alleged that he was led to believe that he would receive a fifteen year sentence followed by parole for life in exchange for his guilty plea. The petition relied on *Santobello* and *Mabry*, and argued that his attorney was ineffective for failing to clarify the sentence, the trial court failed to resolve the ambiguity in the plea agreement, and the prosecutor's statements regarding the plea bargain infected the proceedings with fundamental unfairness. [Motion to Dismiss, Ex. G].

Although organized differently, petitioner presented the same factual allegations and the same federal legal grounds to the California Supreme Court that he presents in his federal petition. *See Chacon v. Wood*, 36 F.3d 1459, 1467 (9th Cir.1994) ("A habeas petitioner may, however, reformulate somewhat his claims made in state court; exhaustion requires only that the substance of the federal claim be fairly presented.") (emphasis in original), *superseded by statute on other grounds as recognized by Morris v. Woodford*, 229 F.3d 775, 779 (9th Cir.2000) (quoting *Tamapua v. Shimoda*, 796 F.2d 261, 262 (9th Cir. 1986)). Accordingly, petitioner claim alleged in ground one of the petition is exhausted.

## The Merits

Petitioner alleges that his plea was constitutionally invalid because (1) based upon the prosecutor's misrepresentations, petitioner believed that he would receive a determinant sentence of 15 years followed by parole for life but, in fact, petitioner was sentenced to an indeterminate term of 15 years to life; (2) petitioner was not aware of the consequences of his plea; and (3) petitioner received ineffective assistance of counsel because his attorney failed to properly advise petitioner of the terms of his plea. [Petition at 6–7; Memorandum in Support of Petition at 7–19].

## Standard of Review

A federal court may not grant a writ of habeas corpus on behalf of a person in state custody "with respect to any claim that was adjudicated on the merits in state court proceedings unless the adjudication of the claim (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding." 28 U.S.C. § 2254(d); *see Duhaime v. Ducharme,* 200 F.3d 597, 600 (9th Cir.1999).

> Under the "contrary to" clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by this Court on a question of law or if the state court decides a case differently than this Court has on a set of materially indistinguishable facts. Under the "unreasonable application" clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from this Court's decisions but unreasonably applies that principle to the facts of the prisoner's case.

*Williams v. Taylor,* 529 U.S. 362, 412–413, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000); *see Weighall v. Middle,* 215 F.3d 1058, 1061 (9th Cir.2000) (discussing *Williams* ).

A federal court making the "unreasonable application" inquiry asks "whether the state court's application of clearly established federal law was objectively unreasonable." *Williams,* 529 U.S. at 409, 120 S.Ct. 1495; *Weighall,* 215 F.3d at 1062. An unreasonable application of federal law is different from an incorrect application of federal law. That is, "a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." *Williams,* 529 U.S. at 411, 120 S.Ct. 1495; *see also Baker v. City of Blaine,* 221 F.3d 1108, 1111 (9th Cir.2000) (holding that in order for a state court's application of federal law to be unreasonable, it must have been clearly erroneous); *Gunn v. Ignacio,* 263 F.3d 965, 969–970 (9th Cir.2001) (explaining that "clearly erroneous" standard applies to determination whether state court decision on breach of plea agreement was an unreasonable application of federal law under 28 U.S.C. § 2254(d)(1) or an unreasonable determination of the facts under 28 U.S.C. § 2254(d)(2)); *Van Tran v. Lindsey,* 212 F.3d 1143, 1152–1154 (9th Cir.2000) (same), *cert. denied,* 531 U.S. 944, 121 S.Ct. 340, 148 L.Ed.2d 274 (2000).

Further, under the AEDPA, this Court "can no longer reverse a state court decision merely because that decision conflicts with Ninth Circuit precedent on a federal Constitutional issue." *Duhaime,* 200 F.3d at 600. Nevertheless, Ninth Circuit case law is relevant because it "may be persuasive authority for purposes of determining whether a particular state court decision is an 'unreasonable application' of Supreme Court law, and also may help ... deter-

mine what law is 'clearly established.'" *Van Tran,* 212 F.3d at 1154, quoting *Duhaime,* 200 F.3d at 600–601; *see also O'Brien v. Dubois,* 145 F.3d 16, 25 (1st Cir.1998) (holding that "to the extent that inferior federal courts have decided factually similar cases, reference to those decisions is appropriate in assessing the reasonableness vel non of the state court's treatment of the contested issue").

Finally, state court findings of fact are presumed to be correct unless petitioner rebuts that presumption by clear and convincing evidence. 28 U.S.C. § 2254(e)(1).

**1. The terms of petitioner's plea agreement were breached**

■ If the government obtains a guilty plea predicated in any significant degree on a promise by the prosecuting attorney, then that promise must be performed. *See Mabry v. Johnson,* 467 U.S. 504, 509, 104 S.Ct. 2543, 81 L.Ed.2d 437 (1984); *Santobello v. New York,* 404 U.S. 257, 262, 92 S.Ct. 495, 30 L.Ed.2d 427 (1971) (a promise that in any degree induces a plea "must be fulfilled"); *Gunn,* 263 F.3d at 969–970; *United States v. Anderson,* 970 F.2d 602, 607 (9th Cir.1992), *amended on other grounds,* 990 F.2d 1163 (9th Cir. 1993); *United States v. Travis,* 735 F.2d 1129, 1132 (9th Cir.1984); *see also United States v. Peglera,* 33 F.3d 412, 414 (4th Cir.1994) ("Because a government that lives up to its commitments is the essence of liberty under law, the harm generated by allowing the government to forego its plea bargain obligations is one which cannot be tolerated."). "[W]hen the prosecution breaches its promise with respect to an executed plea agreement, the defendant pleads guilty on a false premise, and hence his conviction cannot stand." *Mabry,* 467 U.S. at 509, 104 S.Ct. 2543.

■ "Plea agreements are contractual in nature and are measured by contract law standards." *United States v. Keller,*

902 F.2d 1391, 1393 (9th Cir.1990) (citation omitted). In construing a plea agreement, the court must determine what a defendant reasonably understood at the time he entered his plea. *Gunn,* 263 F.3d at 970; *United States v. Packwood,* 848 F.2d 1009, 1011 (9th Cir.1988); *United States v. Quan,* 789 F.2d 711, 713 (9th Cir.1986); *United States v. Rockwell Int'l Corp.,* 124 F.3d 1194, 1199 (10th Cir.1997), *cert. denied,* 523 U.S. 1093, 118 S.Ct. 1559, 140 L.Ed.2d 791 (1998). Given the contractual nature of plea offers, where the government drafts the plea offer, all ambiguities are to be resolved in favor of the defendant. *United States v. Blaylock,* 20 F.3d 1458, 1468 (9th Cir.1994); *United States v. De la Fuente,* 8 F.3d 1333, 1338 (9th Cir. 1993).

■ This Court must determine what petitioner reasonably understood to be the terms of the agreement when he entered the plea. *See De la Fuente,* 8 F.3d at 1337; *United States v. Gerace,* 997 F.2d 1293, 1294 (9th Cir.1993); *Quan,* 789 F.2d at 713. That determination is a question of fact, *Quan,* 789 F.2d at 714, and a state court's findings on the issue generally are entitled to a presumption of correctness under 28 U.S.C. § 2254(e)(1). *Packwood,* 848 F.2d at 1011.

In petitioner's case, the last reasoned opinion of a state court is the one paragraph order of the California Superior Court, which states:

> ... with the exception of one statement in the negotiated disposition statement, and a reference at the time of the taking of the plea on January 4, 1988, the records demonstrate that the advisement was that the sentence would be 15 years to life as provided by law, and that the petitioner well knew this. Specifically, in the felony disposition statement, the

maximum term of 15 years to life is expressly set forth. During the taking of the plea on January 4, 1988, petitioner was expressly advised that the maximum term of imprisonment was 15 years to life. Again, his counsel recited that the only sentence available was 15 years to life. Any ambiguity concerning petitioner's understanding of the sentence he was to receive is put to rest by petitioner's own statement found in the transcript of January 7, 1988 during petitioner's testimony at the trial of Curtis Fauber that he understood his term of imprisonment would be 15 years to life. This is underscored by the judge's comments at the time the sentence was pronounced on March 1, 1988 . . . wherein . . . the court expressly states what the term of imprisonment was to be, to wit, 15 years to life.

[Motion to Dismiss, Ex. F at 50 (citations to exhibits omitted)].

The Superior Court's findings and conclusion rest on a flawed foundation. It lacked the benefit of an evidentiary hearing during which it could have developed the record regarding any discussions or advice which occurred off the record. Understandably, its ruling was based largely on recitations of the term "15 years to life" found in the record, and failed to give adequate consideration to what that legal term actually and reasonably meant to petitioner—a 22 year old with little or no previous contact with the criminal justice system—in the context of what he had already been told. In particular, the Superior Court brushed aside the evidence that petitioner repeatedly had been told— before the use of the phrase "15 years to life"—that he would be sentenced to a maximum term of 15 years in prison and

to a parole term of life. Thus, regardless of how trained attorneys or judges understand the term "15 years to life," petitioner was encouraged to, and actually and reasonably did, understand it differently.[16] In a sense, the Superior Court made the same mistake that the attorneys and the court made at the time of petitioner's change of plea and sentencing: that is, they assumed that a legal term whose meaning was well-known to them was understood in the same way by petitioner. For these reasons, to the extent that the state court's ruling is properly characterized as a factual finding, it is an incorrect and unreasonable one, and petitioner has met his burden of demonstrating by clear and convincing evidence that it is erroneous. *See* 28 U.S.C. § 2254(e)(1).

There is no dispute that petitioner was told, both in writing (in the Felony Disposition Statement which was prepared by Mr. Glynn) and orally (by Mr. Glynn during the change of plea hearing), that in exchange for his guilty plea, he would receive a **maximum sentence of 15 years.** [EH Exs. H & J]. He also was told that after serving that prison term, he might serve a parole term of life. Petitioner was then told by the same prosecutor that he was receiving a term of "15 years to life." Further, either Mr. Wiksell or Mr. Glynn informed petitioner that he could be out in as little as 7½ years. As petitioner credibly testified, and as he has consistently and openly maintained both before and after his sentencing, he understood that he was receiving a sentence of no more than 15 years in prison. Petitioner's understanding was reasonable. The evidence demonstrates that before petitioner pleaded guilty, he was **never** unambiguously informed—whether by Mr. Wiksell, Mr.

16. The Court's conclusion is necessarily based upon the particular circumstances surrounding the advice provided and representations made to petitioner. The extent to which the

term "15 years to life" might be ambiguous or imprecise in other circumstances is not addressed.

Glynn, or the trial court—in language that a layperson could be expected to understand, that he would be subjected to what actually happened to him—an indeterminate life sentence, with parole eligibility after serving a minimum of 10 years. Based upon all of the evidence, it was objectively reasonable for petitioner, who was not trained in the law and who had no previous experience with the criminal justice system or expert knowledge of California's sentencing laws, to believe that a sentence of "15 years to life," meant a maximum prison sentence of 15 years, followed by the possibility of parole for life.[17]

▆ This is true regardless of whether the prosecutor intended to mislead petitioner regarding his sentence. As the record reflects, and as Mr. Glynn conceded, he explained to petitioner that in exchange for his cooperation and guilty plea, petitioner could be sentenced to a maximum prison term of 15 years. Although Mr. Glynn subsequently used the term "15 years to life" in describing petitioner's sentence, by the time that petitioner testified during the guilt phase of Mr. Fauber's trial, which was before petitioner was sentenced, Mr. Glynn knew that petitioner believed that his sentence would allow him to be released after just 7½ years if he behaved himself. Thus, the prosecutor allowed petitioner to go forward with sentencing knowing that the sentence which petitioner believed he had agreed to differed significantly from the sentence which petitioner actually would be required to serve. Whether the prosecutor actively misled petitioner, or, more likely, simply knowingly allowed petitioner to proceed on the basis of a misapprehension regarding the sentence he would receive, the prosecution must fulfill petitioner's reasonable understanding of the plea agreement. *See United States v. Hallam,* 472 F.2d 168, 169 (9th Cir.1973) ("It is clear from *Santobello v. New York* that due respect for the integrity of plea bargains demands that once a defendant has carried out his part of the bargain the Government must fulfill its part."); *United States v. Ingram,* 979 F.2d 1179, 1184 (7th Cir.1992) ("The government must fulfill any promise that it expressly or impliedly makes in exchange for a defendant's guilty plea."), *cert. denied,* 507 U.S. 997, 113 S.Ct. 1616, 123 L.Ed.2d 176(1993); *see also Blaylock,* 20 F.3d at 1468 (noting that any all ambiguities in plea agreement are to be resolved in favor of the defendant).[18]

In light of the foregoing, the state court's rejection of petitioner's claim is

---

**17.** Further, although not conclusive on the issue, the reasonableness of petitioner's understanding is supported by the fact that Mr. Troxel, an experienced investigator working closely with Mr. Glynn on petitioner's case, also understood petitioner's sentence this way.

**18.** Indeed, the fact that the government's promise is either unfulfillable or contrary to the law does not enable the government to rescind the agreement, especially after the defendant has fulfilled his part of the bargain. *See Anderson,* 970 F.2d at 607 (stating "nor does the government's present inability to fulfill its promise mean that it did not breach the plea agreement.") (citing *United States v. Cook,* 668 F.2d 317, 320 (7th Cir.1982)). As explained by the Seventh Circuit, "[a] plea induced by an unfulfillable promise is no less subject to challenge than one induced by a valid promise which the Government simply fails to fulfill." *Cook,* 668 F.2d at 320 (citing *Brady v. United States,* 397 U.S. 742, 755, 90 S.Ct. 1463, 25 L.Ed.2d 747 (1970)); *see also Palermo v. Warden, Green Haven State Prison,* 545 F.2d 286, 296 (2d Cir.1976) (holding that "where a defendant relies on promises by the prosecutor which are in fact unfulfillable, he has a right to have those promises fulfilled."); *United States ex rel. Ferris v. Finkbeiner,* 551 F.2d 185, 186–187 (7th Cir.1977) (holding that fundamental fairness required limiting sentence to agreed-upon term even though it resulted in a sentence not authorized under state law), *cert. denied,* 435 U.S. 932, 98 S.Ct.

both contrary to clearly established federal law as set forth in *Santobello*, 404 U.S. at 263, 92 S.Ct. 495, and based upon an unreasonable or clearly erroneous determination of the facts. *See* 28 U.S.C. § 2254(d). *See Gunn*, 263 F.3d at 969.[19] Accordingly, petitioner is entitled to relief; *Gunn*, 263 F.3d at 969, 971–972 (granting habeas relief based upon *Santobello*, and noting that the government's obligation to fulfill a plea bargain is "clearly established Federal law" within the meaning of the AEDPA).

### 2. The appropriate remedy

A district court has discretion in determining what remedy is appropriate for breach of a plea agreement. *Anderson*, 970 F.2d at 608; *United States v. Boatner*, 966 F.2d 1575, 1580 (11th Cir. 1992). The Court may order specific performance, or it may grant petitioner the option of withdrawing his plea and repleading or proceeding to trial. *Santobello*, 404 U.S. at 263, 92 S.Ct. 495; *Anderson*, 970 F.2d at 608 & n. 8. In this case, however, merely allowing petitioner to withdraw his plea is not a viable form of relief. Not only has petitioner served all, or nearly all, of the prison term for which he bargained, he also has placed himself at

risk by testifying on behalf of the prosecution against Messrs. Fauber and Caldwell. The prosecution received the benefits of its bargain, benefits which cannot be restored to petitioner if his plea was to be rescinded. Accordingly, the appropriate remedy is specific performance. *See Carter v. McCarthy*, 806 F.2d 1373, 1377 (9th Cir.1986) (holding that specific performance of a broken plea agreement was the only remedy because petitioner already had served a sentence in excess of the one he had bargained for and leave to withdraw his plea would have been of no benefit to him), *cert. denied*, 484 U.S. 870, 108 S.Ct. 198, 98 L.Ed.2d 149 (1987); *Hallam*, 472 F.2d at 169 (stating that *Santobello* "demands that once a defendant has carried out his part of the bargain the Government must fulfill its part."). *See also Boatner*, 966 F.2d at 1580; *United States ex rel. Ferris v. Finkbeiner*, 551 F.2d 185, 186(7th Cir.1977); *Palermo v. Warden, Green Haven State Prison*, 545 F.2d 286, 297 (2d Cir.1976). There being no other adequate remedy, petitioner is entitled to immediate release no later than the expiration of his 15 year term.[20] Although the Court cannot determine the precise date, it appears that petitioner's sentence will expire in the very near future, if it has not already done so.[21]

1508, 55 L.Ed.2d 530 (1978); *Correale v. United States*, 479 F.2d 944, 947–950 (1st Cir.1973) (concluding that the only just remedy was enforcement of the promise made by the prosecutor even though it resulted in an illegal sentence).

**19.** As the Ninth Circuit explained in *Gunn*,

It can be difficult to classify an analysis as an "unreasonable application" of federal law as determined by the Supreme Court, or alternatively as an "unreasonable determination of the facts" bearing out that application. But because we use the same deferential "clearly erroneous" standard for both determinations, "if we are wrong" in this classification, sometimes "it makes no difference."

*Gunn*, 263 F.3d at 969 (quoting *Torres v. Prunty*, 223 F.3d 1103, 1107 (9th Cir.2000)).

**20.** Petitioner may in fact be entitled to be released before the 15 year anniversary of his sentencing because he may be owed presentence and other credits. The parties have not addressed this issue, and the record lacks sufficient information to enable the Court to make this determination.

**21.** The minute order of petitioner's sentencing in Superior Court, on March 1, 1998, provides 110 actual days of jail credit, and 55 days credit under California Penal Code § 4019(b) (providing, *inter alia*, credit for work release and good behavior), for a total of 165 days. [CT at 14] The Abstract of Judgment committing petitioner to state prison

The final question is whether petitioner remains subject to a term of parole, and if so, what that term may be. The parties have not addressed this issue. Petitioner believed at the time of his change of plea that in addition to a maximum term of 15 years in custody, he faced the possibility of parole for life. Because petitioner has now served all, or nearly all, of his custodial sentence, however, whether petitioner may be placed on parole, and if so, for how long a period, is unclear. Under these circumstances, the Court merely notes that a parole term of some duration may be imposed upon petitioner's release from custody, if authorized by state law.

### 3. Petitioner's other claims

Because petitioner is entitled to relief on the basis of this claim, a determination of petitioner's remaining claims is not necessary. *See Robbins v. Smith*, 152 F.3d 1062, 1068–1069 (9th Cir.1997), *rev'd on other grounds*, 528 U.S. 259, 120 S.Ct. 746, 145 L.Ed.2d 756 (2000); *Rice v. Wood*, 44 F.3d 1396, 1402 n. 10 (9th Cir.1995), *vacated in part on other grounds*, 77 F.3d 1138 (9th Cir.) (en banc), *cert. denied*, 519 U.S. 873, 117 S.Ct. 191, 136 L.Ed.2d 129 (1996); *Blazak v. Ricketts*, 971 F.2d 1408, 1413–1414 (9th Cir.1992) (per curiam). Even if petitioner prevailed on one or more of his other claims, he could obtain no greater relief than that to which he already is entitled.

### Conclusion

It is recommended that judgment be entered granting the petition and directing respondent to release petitioner from custody upon the expiration of petitioner's 15

indicates credit of 110 days for time served.

year sentence, after taking into account any time credits earned by petitioner.

Oct. 4, 2002.